## Case No. 8,006

### LAMAR v. DANA.

[18 Int. Rev. Rec. 163.]

Circuit Court, S. D. New York, 1873.

FALSE IMPRISONMENT— TIME OF REBELLION— ORDER OF PRESIDENT— MOTIVE.

[A public ministerial officer, who, upon an order emanating from the president, during the Rebellion, causes the arrest of one residing within the rebellious states, is not liable in an action for false imprisonment, unless it can be shown that he co-operated with or induced the president to issue the order from motives to oppress.]

[This was an action brought in the state court by Gazzaway B. Lamar against Charles A. Dana for damages on account of false imprisonment. The case was removed to the circuit court, which afterwards denied a motion of plaintiff to remand. Case No. 8,005. The case is now heard in the circuit court before a jury.]

William D. Shipman, for plaintiff.
Noah Davis, for defendant.

SHIPMAN, District Judge (charging jury). This is an action of false imprisonment brought in the year 1868 by Mr. Lamar, then and now a resident of Georgia, against Charles A. Dana, then and now a resident of this state, but formerly assistant secretary of war. The undisputed facts in the case are briefly as follows: Prior to December, 1864, Mr. Lamar was a citizen of the state of Georgia, where he continued to reside until the date of his arrest, on or about April 28, 1865. Prior to December, 1864, the inhabitants of the state of Georgia were in a state of rebellion against the government of the United States, and the territory of the state was in the occupancy of armed rebels, and the

authority of the United States was there overthrown. In December, 1864, the city of Savannah was taken by the United States troops, General Sherman commanding, and from that time to May, 1865, and subsequently, was occupied by United States troops, who held the city by force of arms. The city was governed during this time by martial law—first under the immediate authority of General Sherman, and thereafter under the authority of General Grover. The previously existing common law courts and tribunals were closed, and there was during this time no existing civil authority; but the authority of the United States government was maintained by military rule exclusively and by constraint of arms. On the 15th of May, 1865, President Lincoln was assassinated, and President Johnson became acting president, and, as such, the commander-in-chief of the armies of the United States. On the 28th of April Mr. Stanton, the secretary of war, sent for Mr. Dana, the assistant secretary, and said: "I want you to arrest Mr. Lamar. We have reason to believe that he was concerned in the death of Mr. Lincoln. What officer have you whom you can send?" General Jeffers was named, of which choice Mr. Stanton told Mr. Dana to make the order and to sign it by order of the president. Mr. Dana wrote the order, and further testifies that he knew nothing of the reasons which induced Mr. Stanton to make the statement. The order directed General Jeffers to arrest Mr. Lamar, to bring him to Washington and report to the commanding general for orders. General Jeffers proceeded to Savannah, arrested Mr. Lamar at night, brought him to Washington, where he was forthwith confined in the old Capitol prison as a prisoner, in a small room with fourteen other persons, and was kept closely confined for a period of about three months, he being then in a state of ill health. The circumstances of the imprisonment he has stated, and they are not denied. He was formally released on parole. He reported monthly to the commanding general till the latter part of 1867. No charges, civil or military, were brought against him, and he was never informed of the cause of his arrest. General Johnston surrendered on April 30, 1865, and peace was formally proclaimed some time in August, 1865. For this arrest and imprisonment Mr. Lamar brings this action against Mr. Dana. By statute of the United States it is provided that no such action for such causes can be maintained, except brought within two years after the commission of the act. But with this statute you have nothing to do, the same not having been pleaded, and the case will be considered as if brought within the proper time. The case is properly before the court, which has legal jurisdiction of it in all its aspects, and can proceed to final judgment, subject to the revision of the court of last resort. The question is whether, under these facts, and others to which I shall call your attention, Mr. Dana is legally liable to damages for this arrest and

imprisonment. And I shall here lay out of the case the statutes of 1863, 1866, and 1867. What my opinion of the validity of those statutes may be is immaterial. I treat them as if they had not been made, and I shall consider the principles of law applicable to this case as if they did not exist.

This government is one of law, and nobody can be legally arrested except it be according to known and established principles of law of some kind. It is not claimed by any one that this order was issued according to the principles of the common law, using that term in its restricted sense, as the law under which civil courts ordinarily act. Military law proper is applicable only to the members of the army and navy. It was not made under that. But it is claimed that it was made under and by force of martial law, which, as applicable to the present state of facts, is this: When a portion of a country has been in a state of successful rebellion against the constituted authorities, and in the course of the war that rebellious portion has been taken possession of by the armed forces of the regular government, and is held by force of arms, and the civil courts are closed, and there are no existing civil tribunals for the preservation of order, then the commanding general governs the country and its inhabitants for the time being by martial law—that is, by rules and regulations proclaimed by the military authorities and enforced by military power. It is admitted that General Sherman had proclaimed, was enforcing and had a right to enforce martial law over the citizens of Savannah, of which Mr. Lamar was one, and thus to punish any of the well known and recognized crimes committed by those citizens, or to restrain any line of conduct not amounting to crimes or misdemeanors which had been prohibited by proclamation. But it is denied that the president, as commander-in-chief of the armies of the United States, had power of his own motion to arrest citizens of Savannah for crime, and to bring them to Washington and there incarcerate them without the knowledge or intervention of the general in command in Savannah, and thus, for the time being, act superior to or in disregard of the local military authorities. It is true that the president, as commander-in-chief, had no authority to arrest and to hold for trial before a court-martial or a military tribunal, or to detain for an unreasonable time persons not in the military service residing in the so-called loyal states when civil courts were open, because where the courts were open and the civil authorities were unobstructed, and there was no existing rebellion, martial law did not legally exist. The supreme court of the United States substantially decided in the Milligan Case [4 Wall. (71 U. S.) 2], so often referred to, that a military order to arrest and confine in jail for an unreasonable time a citizen residing in a state not in rebellion would be an illegal order. But the question here is whether the commander-in-chief could at this time, by virtue of martial law, arrest and bring to Washington a citizen of Savannah, then living there, under martial law, because the president had reason to believe, and did believe that such citizen had been guilty of an act well known and recognized by all people to be a crime. I am here speaking of the facts in this case. Mr. Lamar was not arrested because he was an enemy generally—was not arrested because having been in a rebellious state and gave aid and comfort to the enemy, he was regarded as a traitor; but he was arrested for a particular offence. I answer yes, under certain restrictions. The commander-in-chief must have good reason to believe that the person against whom he issued the order did commit a crime; must not utter the order for the purposes of oppression, and must not detain the citizens for such a time that his act becomes oppressive and unjustifiable. If he utters the order for the mere purposes of oppression, or does detain the citizen so that the detention becomes unjustifiably oppressive, he is responsible in damages. In general terms, the commander-in-chief might lawfully arrest any one in Savannah, the same being under martial law, who, from the information before him, he had reasonable ground to believe was then engaged in inciting further rebellion or had committed such a crime as the assassination of Mr. Lincoln. Within the immediate theatre of insurrection or war the commander-in-chief and his subordinates, when the exigencies of the occasion make it necessary, possess this power of martial law. This announcement of the law relates exclusively to President Johnson. But President Johnson is not sued here, Mr. Dana is sued, and the question is whether Mr. Dana is in any manner liable for this order. There is no question that the president issued this order, for it is admitted in the declaration. I charge you that, in my opinion, the president, as commander-in-chief, had the right to give the order, if he had reason to believe that a crime had been committed by Mr. Lamar, and that the order, upon its face, was a valid and legal order. If Mr. Johnson issued it from motives of oppression he is liable, but upon the face of the order it was a valid and legal document; and Mr. Dana, being a public ministerial officer, acting merely as a clerk of the commander in signing the order by authority of the president, did not make himself liable, unless he conspired with, co-operated with, or induced the president to issue it from motives to oppress. Had the president told Mr. Dana to issue an order arresting one of you living in New York Mr. Dana might have been liable, because, on its face, that would have been an illegal order. When the president told Mr. Dana to issue an order under martial law arresting a Savannah citizen for a crime Mr. Dana is not liable, because, on its face, the president had a right to issue such an order. So if Mr. Johnson wilfully kept Mr. Lamar in confinement

unjustifiably, and did not release him when it was reasonable that he should be released, he is liable. If Mr. Dana by his own act wilfully kept Mr. Lamar in confinement for an unjustifiable time, then he would be liable. But if Mr. Dana, being a subordinate ministerial officer, knew nothing of the length of confinement and did not co-operate with and induce President Johnson to keep him, then Mr. Dana is not liable for the undue confinement.

Two questions of fact arise: First. Was this order issued without cause and for motive to oppress Mr. Lamar, and did Mr. Dana knowingly co-operate with President Johnson to issue such an oppressive order? Second. Did Mr. Dana knowingly and wilfully assist in the detention of Mr. Lamar unreasonably after his arrival at Washington? As there is no evidence on the subject except that of Mr. Dana himself, who testifies in the negative upon both of these points, it will be your duty to render a verdict for the defendant. These are important and vital questions, and they are placed in such form and statement that they can be reviewed, and, if wrong, rectified by the court of last resort in this country.

A Juror—Would it be proper to ask if the order was direct from the president to Mr. Dana or from Mr. Stanton to Mr. Dana?

THE COURT—That is immaterial in this case, because it is averred in the declaration that the order was issued by order of the president. . If it had not been so averred I should have charged you to find, as a matter of fact, whether in fact it was issued by order of the president, and then it would have been very proper for you to have considered the question you have inquired about.

The jury soon after retired. After the lapse of an hour the judge sent for them, and when they had taken their seats the court said they must have mistaken the direction that had been given them. He read again from his charge, and stated that, under the view of the court, it was their duty to find a verdict for the defendant. The responsibility rested on the court which directed them to do so.

A Juror—I desire to know if the jurors are nonentities in this matter?

THE JUDGE—You are directed by the court to find a verdict for the defendant. If that is wrong it will be reviewed by the supreme court of the United States. If your conscience is aggrieved, I will take care of it.

Juror (inquiringly)—Will you take care of my conscience? (Laughter).

THE JUDGE—Yes. (More laughter).

Under the direction of THE COURT the jury rendered a verdict for the defendant. It is understood that nine of them stood in favor of the defendant and three for the plaintiff.